(Reap. Dec. 8728)

F. W. Myers & Co., Inc. *v.* United States

Entry No. A–1380.

(Decided January 17, 1957)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*William J. Vitale*, trial attorney), for the defendant.

Mollison, Judge: This is an appeal for reappraisement of the value of certain men's Argyle hosiery, imported from Canada on or about August 26, 1950. The imported hosiery, which is designated by the exporter as item HA 1112, was entered at the value of $12.92 per dozen, packed. It was appraised at $16.75 per dozen, packed, and, on the trial of the issue, it was contended by the plaintiff that

the correct entered value should have been $12.50 per dozen, packed. All values are in Canadian currency.

The appraisement was made on the basis of foreign value of similar hosiery offered and sold by another manufacturer in Canada under a designation as item HA 1118. It appears that the HA in each instance denotes that the hosiery was "hand-framed" anklet type hosiery, the "H" denoting the use of a small hand-operated machine to make this type of hosiery; that the first two numbers, 11, denote the quality, while the last two numbers denote the style or pattern. Thus, it seems that HA 1112 and HA 1118 were both hand-framed anklet hosiery of the same quality but of different pattern or styles.

The record shows that the manufacturer and exporter, the Hudson Hosiery Co., Ltd., of Hudson, Quebec (hereinafter referred to as "Hudson"), did not have the machines necessary to produce the entire hand-framed anklet, and purchased this type of hosiery from the Morrisburg Hosiery Co., Ltd., of Morrisburg, Ontario (hereinafter referred to as "Morrisburg"), in an incompletely manufactured state, i. e., as it came off the knitting machines and with open toes, and finished the same by sewing up the toe, inspecting, mending (if necessary), pressing, pairing, transferring (or putting on a label with a hot iron), and boxing.

It also appears that the anklets made for Hudson by Morrisburg were according to Hudson's own designs as to pattern and colors.

Plaintiff contends that *such* hosiery, i. e., item HA 1112, was freely offered for sale for home consumption in Canada or for exportation to the United States, within the definitions of foreign and export value, set forth in section 402 (c) and (d) of the Tariff Act of 1930, as amended, at a price of Canadian $12.50 per dozen f. o. b. Hudson, Quebec.

Defendant contends that *such* hosiery, i. e., item HA 1112, was not freely offered for sale to all purchasers, either for home consumption or for exportation to the United States, but that similar merchandise, i. e., item HA 1118, was freely offered for sale by Morrisburg for home consumption within the meaning of the foreign value statute and formed the basis for the appraisement and represents the correct value of the merchandise.

At this point, it should be stated that defendant does not wholly admit that Morrisburg's HA 1118 was not "such" merchandise as Hudson's HA 1112 within the meaning of the statute. At the outset of the case, Government counsel relied upon the fact that the two items were identical merchandise and came within the scope of "such" merchandise. However, as the case progressed, there was a concurrent reliance upon the claim that HA 1118 was "similar" to, if not "such" as, HA 1112. The court is of the opinion, and so rules,

that the demonstrated facts that HA 1118 was offered for sale as the final output of a different manufacturer than the one who finished and offered the merchandise at bar, and that HA 1118 was made up in different patterns and colors than HA 1112, remove it from the category of merchandise "such" as HA 1112, and that, at most, it can be considered only as "similar" to HA 1112.   *Cf. United States* v. *Johnson Co.*, 9 Ct. Cust. Appls. 258, T. D. 38215.

As its case in chief, plaintiff offered the testimony of two witnesses, Fred Hodgson, the secretary-treasurer, and William Bourke, the president, of Hudson, the manufacturer and exporter of the merchandise at bar. These witnesses testified that, at the time of exportation of the merchandise under appraisement, such merchandise (HA 1112) was offered for sale by Hudson to all purchasers, irrespective of category, without restriction of any kind and without respect to quantity ordered, at a single price, to wit, $12.50 per dozen, packed, both for home consumption and for exportation to the United States.

To support its position and to rebut the testimony of these witnesses, the defendant relied upon vigorous cross-examination of the witnesses, interrogation of Mr. Hodgson with respect to alleged prior inconsistent statements said to have been made by him to Treasury representatives, reports of the said Treasury representatives, including a letter from Mr. Hodgson and one from a former vice president of the manufacturer and exporter, and the testimony of one of the Treasury representatives.

It should be noted that, at the time of trial, certain objections were made by counsel for the plaintiff to certain portions of a Treasury representative's report received in evidence as defendant's exhibit A, with certain exceptions, and decision on the objections was reserved. The court has examined the offered material in the light of the objections made and overrules the objections, admitting the offered material as part of defendant's exhibit A.

The point in greatest dispute, and that upon which the issue clearly turns, is whether or not Hudson offered its merchandise for sale to all purchasers except small retailers.   It is the defendant's contention that this was so, and indicates a restrictive policy pursued by Hudson in the offer of its merchandise, in that it was not offered to "all" purchasers, which would bar a finding of foreign or export value for "such" merchandise.

As proof of this contention, the defendant relies upon statements, oral and written, said to have been made by Mr. Hodgson to a Treasury representative to this effect, and similar statements, both oral and written, said to have been made by one W. R. Mathews, a former vice president of Hudson.

Mr. Hodgson personally testified at the trial under the sanctions

of oath and cross-examination. His testimony on direct examination was not in any material way shaken on cross-examination. According to defendant's collective exhibit A, a report of Treasury Representative J. C. Fawcett, dated July 14, 1952, on some unspecified date between August 23, 1951, and subsequently, Mr. Hodgson gave Mr. Fawcett information, resulting in the following statement by the Treasury representative in his report:

Mr. Hodgson is also Secretary-Treasurer of the Morrisburg Hosiery Company, Limited, Morrisburg, Ontario, an affiliate of the Hudson Hosiery Company, Limited, which was formed in 1946 for the purpose of providing an outlet for sales to small retailers since Hudson could not sell to retailers as such action would, of course, be objected to by wholesalers purchasing from Hudson.

Mr. Hodgson denied under oath that he had said to Mr. Fawcett that the Morrisburg Co. was formed in 1946 for the purpose of providing an outlet to small retailers and that Hudson could not sell to retailers as such an action would be subject to criticism by the wholesalers who purchased from Hudson. (Tr. pp. 19–20.)

Mr. Fawcett, likewise under oath, testified that Mr. Hodgson told him that his company did not sell to small retailers and further testified that that statement was based primarily on, or in connection with, a discussion of the Morrisburg Co. (Tr. p. 80, 85.)

The court is confronted with a declaration made under oath as to a statement made approximately 4 years before the trial, which declaration is contradicted under oath by the person alleged to have made the statement. Neither of the witnesses was testifying from notes made at the time of the controverted statement, and neither party has produced other evidence connected with the making of the alleged statement which would tend to establish the truth of the matter. The court notes that the report in which the controverted statement appears was made nearly 11 months after the time when the statement was said to have been made; that no contemporaneous notes were offered to be produced; and that the statement contained in the report purports to be the substance of a conversation rather than a direct quotation.

The court has observed the witnesses and considers it no reflection upon either of them that the controversy should have arisen, and concludes that the preponderance in weight of the available evidence favors the contention of the plaintiff, i. e., that the statement was not made.

The second prior inconsistent statement charged to Mr. Hodgson is claimed to be contained in a letter, a copy of which was received in evidence as defendant's exhibit B, dated June 16, 1953, addressed by Mr. Hodgson to Mr. Fawcett. The body of the letter reads as follows:

Dear Sir:

It appears that because of certain statements and correspondence between Mr. Mathews and Mr. Geisler of the Treasury Department that the custom entries on our shipments to the U. S. are being held up on account of a basis for appraisal. The basis being that our product was not being freely offered for sale. The diamond hosiery in question has always been freely offered for sale and we never turned down any orders as we were interested in selling the production of the plant. The size and capacity of the plant is very limited which in turn controlled the sales We sold the output to large users and had we been short of orders our sales would have been made to all users.

The Hudson Hosiery Company was not producing the diamond hose in their plant but purchasing it from the Morrisburg Hosiery Company Limited for resale. The same hosiery was sold from both plants. As this is the same product the Treasury Department is combining the Hudson Hosiery Company Limited and the Morrisburg Hosiery Company Limited for the purpose of finding the freely offered price to purchasers in Canada.

Mr. Faucett [sic] has been through the invoices of both these Companies and he found that less than 5% of the sales were sold at retail prices. It is our contention that our price to wholesalers in Canada is the freely offered price.

In the brief filed on behalf of the defendant, the last sentence of the first paragraph above is quoted, with the following observation:

* * * From that clear and unambiguous language, it must be concluded that the Hudson Company only sold to small "users" if they had any merchandise left after taking care of orders from large *users*. Surely, such a restriction or restraint in trade is not indicative of a free and open market. [Italics quoted.]

The gist of the quoted statement, when read, not alone, but with what goes before it, is that, because large users took up the output of the plant, there was insufficient production to take care of sales to small users. It is to be noted that in the preceding two sentences it is pointed out that *offers* were made to all, but that the acceptance of the offers by large users, being the *sales* that followed from the *offers*, gave the indicated result. The letter does not establish that the result was company policy or that the offeror sought that result. The valuation statute does not require that *sales* be effected to all purchasers, but only that the merchandise be freely *offered* to all purchasers. No such restriction of free offer as is suggested by the defendant is established or tends to be established by the Hodgson letter.

The remaining evidence offered by the defendant on the point relates to oral and written statements said to have been made by W. R. Mathews to Treasury Representatives Fawcett and Geisler at various times, to the effect that no offers or sales of Hudson's products were made to small retailers, except as an accommodation.

Mr. Mathews was not produced as a witness by either side. The statements, therefore, are not prior inconsistent statements by a witness, but presumably were offered as statements made *ante litam motam* by an officer of the manufacturing and exporting company, in

privity with the plaintiff, inconsistent with the position taken by the plaintiff at the trial. Plaintiff's rebuttal of the effect of this evidence takes a twofold form: (1) By countering with the sworn testimony of other officers of the same company that such statements were not true, and (2) by denying that Mr. Mathews had the authority to make the statements.

It appears that Mr. Mathews was vice president and sales manager of Hudson until November 1950, when, according to the testimony of the president of the firm, he ceased to hold those offices and "was on a restricted basis as an ordinary salesman in a small area in Montreal only." It appears that most of the oral statements credited to Mr. Mathews and the written statement in contained defendant's exhibit G were made after the time when he ceased to hold office in the company and could, in any sense, bind it by his statements. It is not clear when any statements were made by Mr. Mathews before that time, but, even if they were so made, such statements as evidence are outweighed by the sworn testimony of the secretary-treasurer and president of the firm contradicting such statements.

I find that plaintiff made out a *prima facie* case in favor of its contention that a foreign and export value existed for such merchandise and that such value was $12.50 per dozen pairs, packed, f. o. b. Hudson, Quebec. Indeed, an examination of the evidence offered by the defendant to support foreign value for similar merchandise shows that the price at which it was offered depended upon the category of the purchaser and that there was no uniform price at which it was offered for sale to all purchasers. The defendant has thereby discredited the value returned by the appraiser, based upon such evidence. See *United States* v. *M. V. Jenkins et al.*, 26 Cust. Ct. 467, Reap. Dec. 7924, affirmed in *Same* v. *Same*, 39 C. C. P. A. (Customs) 158, C. A. D. 479; and *Glanson Co.* v. *United States*, 29 Cust. Ct. 508, Reap. Dec. 8182, reversed and remanded on other grounds in *Same* v. *Same*, 31 Cust. Ct. 473, A. R. D. 33.

In any event, however, the *prima facie* case made out by plaintiff in favor of foreign and export value for such merchandise would prevail over any showing of the existence of foreign value for similar merchandise, upon which the appraisement was based. Section 402 (a) (1), and *United States* v. *Meadows Wye & Co., Inc.*, 15 Ct. Cust. Appls. 451, T. D. 42643.

On the entire record before me, I find as facts:

(1) That the merchandise in question consists of men's Argyle hand-framed anklet hosiery, item HA 1112, exported from Canada on August 26, 1950.

(2) That at the time of exportation of the involved hosiery the principal market in Canada for the sale of such hosiery was Hudson, Quebec.

(3)   That at the time of exportation of the involved hosiery such merchandise was freely offered for sale in Hudson, Quebec, to all purchasers for home consumption in Canada or for exportation to the United States, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, at the price of Canadian $12.50 per dozen.

I conclude as matters of law:

I   That the proper basis of value for the merchandise here involved is foreign and export value, as defined in section 402 (c) and (d) of the Tariff Act of 1930, as amended, and

II   That the said foreign and export value is Canadian $12.50 per dozen, packed.

Judgment will issue accordingly.